IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PRIVACASH, INC.,

                Plaintiff,

      v.

AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY and
AMERICAN EXPRESS PREPAID CARD
MANAGEMENT CORPORATION,

                Defendants.

OPINION AND ORDER

13-cv-86-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff PrivaCash, Inc., is suing defendants American Express Travel Related Services Company and American Express Prepaid Management Corporation for allegedly infringing plaintiff's U.S. Patent No. 8,219,474 entitled "Method and System for Distributing and Activating a Non-Personalized Purchase Card," by carrying out in the United States activities relating to transactions using purchase cards capable of being funded for a predetermined amount of money, as well as activities relating to the sale, distribution and funding of such purchase cards.  Plaintiff has moved for summary judgment on its claim of infringement.  Defendants oppose the motion and have filed their own, seeking summary judgment on all of plaintiff's claims on the grounds that the claims are invalid and not infringed.

1

I conclude that a prior art patent renders obvious all of the disputed claims of the '474 patent, which means that the '474 patent is invalid and cannot be asserted against defendants.  Defendants' motion for summary judgment will be granted.

From the facts proposed by the parties, I find that the following are undisputed.

## UNDISPUTED FACTS

### A. The Parties

Defendant American Express Travel Related Services Co. is the parent of defendant American Express Prepaid Card Management Corporation.  Plaintiff PrivaCash, Inc. is the owner of the '474 patent.  All of the parties are involved in the development, sale and distribution of prefunded cards that can be used to make purchases in stores or over the internet.

The inventors of the '474 patent are David Sutton and Douglas Blasiman.  Neither had any prior experience in the prepaid cash industry before 1999, when they filed their application for a "cash card" that did not identify the card bearer.  At least four patents claim priority to that application, including the '474 patent in suit and U.S. Patent No. 7,328,181, which was litigated in this district in a suit filed in 2009, PrivaCash, Inc. v. American Express Company, case no. 09-cv-391-slc.

### B. The Patent in Suit

The '474 patent issued in 2012 on an application filed in 2010.  It claims priority to

2

U.S. Patent Application No. 09/363,499, filed on July 29, 1999.  The claims at issue are the two independent claims of the patent, 1 and 17, and dependent claims 4, 10-17, 23, 29, 31, and 36.   In relevant part, the claims read as follows:

> 1. A method comprising:
>> [a] authorizing a plurality of purchase card outlets to sell unfunded physical purchase cards,
>> [b] each of the purchase cards including a major credit card organization brand and an associated account number,
>> [c] each card for sale not including any information associated with or provided by a prospective cardholder, and
>> [d] when funded, the card being usable to make purchases at retail establishments that accept credit cards of the major credit card organization, including retail establishments not associated with the plurality of purchase card outlets;
>> [e] authorizing distribution of the purchase cards to the plurality of purchase card outlets; and
>> [f] authorizing funding of a purchase card account associated with one of the purchase cards for a specified amount of money.

> 4. The method of claim 1 or 2 wherein each of the purchase cards has imprinted thereon a predetermined monetary denomination.

> 10. The method of claim 1 or 5 wherein no information associated with any prospective cardholder is collected.

> 11. The method of claim 1 . . . wherein the method further comprises the step of [g] authorizing a purchase transaction against the funded card account after the purchase card account number and a monetary purchase amount have been transmitted to verify that the monetary purchase amount does not exceed the account's available balance and [h] without requiring any information from the cardholder.

> 12. The method of claim 11 wherein the one of the purchase cards has an associated card date beyond which the card may not be used and wherein authorizing a purchase transaction occurs after verifying that the date of the purchase transaction is not beyond the card date.

> 13. The method of claim 12 wherein the card date is imprinted on the card.

14. The method of claim 12 wherein the purchase cards are distributed in blocks of cards.

15. The method of claim 11 wherein authorizing funding of a purchase card account is done using a software-implemented application.

16. The method of claim 11 wherein each of the purchase cards, once funded, is usable at online retail establishments and bricks-and-mortar retail establishments.

17. A method comprising:
    [a] distributing unfunded physical purchase cards to a plurality of purchase card outlets for sale by the purchase card outlets,
    [b] each of the purchase cards including a major credit card organization brand and an associated account number,
    [c] each distributed card not including any information associated with or provided by a prospective cardholder, and
    [d] when funded, the card being usable to make purchases at retail establishments that accept credit cards of the major credit card organization, including retail establishments not associated with the plurality of purchase card outlets; and
    [e] funding a purchase card account associated with one of the purchase cards for a specified amount of money.

23. The method of claim 17 or 21 wherein each of the purchase cards has imprinted thereon a predetermined monetary denomination

29. The method of claim 17 or 24 wherein no information associated with any prospective cardholder is collected.

31. The method of claim 30 wherein the one of the purchase cards has an associated card date beyond which the card may not be used and wherein authorizing a purchase transaction occurs after verifying that the date of the purchase transaction is not beyond the card date.

36. The method of claim . . . 17 wherein the funding [of] a purchase card account is done without requiring the person acquiring the card to provide any personal information.

The '474 patent is one of a family of patents that relate generally to a method for making a purchase over the Internet, and more particularly to "a method of transacting an

anonymous purchase through the use of intermediary credit account information." '474 pat., Background of the Invention, col. 1, lns 15-18.  The basic idea is a "unique and non-traceable Master Card or Visa credit account number," '474 pat., col. 3, lns. 6-22, sold without a cardholder name at retail outlets such as Walmart or 7-Eleven in various predetermined denominations.  Id.  According to the patent, the credit card provider sells cards on a consignment basis to the retailer (referred to in the patent as a "purchasing intermediary"), for a predetermined amount (e.g., $23), corresponding "to a credit limit that is associated with the purchasing card."  The purchasing intermediary then sells the cards to consumers for a predetermined amount (e.g., $25 for a card with a credit limit of $22) and keeps the $3 difference as a service fee.  Id. at lns. 25-35.  Although the purchase card has a credit account number, the number is not part of the transaction and is not linked to the consumer.  Id. at lns. 54-56.  The specification provides that "each purchasing card **40** is a 'bearer card' which means it is as good as cash."  Id. at lns. 56-57.

The card is not activated until after the consumer buys the card.  Activation is accomplished when the purchasing intermediary, Walmart or 7-Eleven or some other retail outlet, enters the credit card number shown on the card into the "intermediary software-implemented application" operated by the purchasing intermediary.  Id. at col. 3, lns. 63 to col. 4, ln. 1.  (The patent does not disclose any details of this "software-implemented application.")  "Upon activation, the consumer has a set time to exhaust the available funds of their purchasing card."  Col. 4, lns. 24-26.  "Any residual funds remaining on the consumer's purchasing card may be drawn out (e.g., using any ATM facility or bank) prior

5

to the expiration date by the consumer." Col. 5, lns. 33-36.  (The patent does not explain how consumers obtain the personal identification numbers (PINs) that would be required to withdraw funds from an ATM.)

Alternatively, the consumer may acquire the intermediary credit account information by going directly to an intermediary application to obtain intermediary credit account information (credit account number, an expiration date and a credit limit).  Col. 4, lns. 31-41.  In this instance, the consumer does not obtain an actual card but uses the intermediary credit information to make online purchases.  Id. at lns. 55-57.  Whether the consumer buys an actual card using a credit card to make the purchase or acquires intermediary credit account information, her monthly bill from her credit card provider will show only the name of the purchasing intermediary and the aggregate amount of the card purchase.  Col. 3, lns. 47-50, col. 4, lns. 48-51.

### C. Accused Products

Defendants sell a number of gift cards, eight of which are accused in this lawsuit:

- predenominated American Express Gift and Mall cards;
- variable load American Express Gift and Mall cards;
- American Express *GlobalTravel* cards;
- American Express Prepaid reloadable cards (temporary version);
- American Express Bluebird cards (temporary version);
- American Express Campus Edition Prepaid reloadable cards/Barnes & Noble cards (temporary version);
- American Express Serve cards (temporary version);
- American Express for Target cards (temporary version).

The cards are sold only in brick and mortar stores.  All of them carry a signature panel on

the back of the card and have done so since 2012.   The cardholder agreements for defendants' cards set forth the terms and conditions for the use of each kind of card and are included with the card.  A customer who discovers the requirement when she removes the card from its packaging and does not want to comply with it can return the card for a full refund.  Defendants enforce their "sign the card" rule by making merchants liable for a "chargeback" if the merchant fails to make sure that the card is signed and the transaction turns out to be fraudulent.  This obligation does not apply to online purchases or transactions at which the merchant has no face-to-face contact with the consumer, such as consumer-operated terminals at gas stations.

### D. Prior Art

U.S. Patent No. 5,473,500 issued to Risafi on October 29, 2002.  It was the basis for the patent office's rejections of two patent applications filed by plaintiff (patent applications No. 10/821,158 and No. 10/621,162).   The '158 application was made final after the rejection, '158 Pt. App. dkt. #64-11 at 9; the '162 application was amended and rejected again in light of patents issued to Gillin and Davis.  '162 Pt. App., dkt #64-12 at 28-30.

The Risafi patent disclosed the idea of both individually and batch activated prepaid cards available for sale at merchant locations; only the individually activated cards are relevant to this case.  Dkt. #64-10.  Risafi disclosed a prepaid card that had an account number and a major credit card brand, allowed for selection of a PIN by the purchaser of the card, but did not show a PIN, cardholder name or signature space on the card and was

individually activated, was not sold in predetermined denominations and was reloadable. Id. at cols. 3-4.  In the "Background" section of the '500 patent, Risafi explained that "prepaid cards have been issued in association with particular merchants . . . . The cards are typically available in preset denominations (e.g., $10, $500, $100) and may or may not be activated before being shipped to the store." Id. at col. 2, lns 8-14.  Once activated, the card disclosed by Risafi could be used anywhere in the world "at a wide variety of approved establishments."  Id. at col. 6, lns. 65-67.  It was anonymous and could be used anywhere that a MasterCard was accepted because the purchaser was not required to provide any information about herself, even if she used a PIN.  Risafi touted the card as more secure than a cash card "because a PIN or a verified signature may be required to use it."   Id. at col. 7, lns. 52-53.

During the prosecution of the '474 patent, plaintiff disclosed the Risafi patent to the examiner as one of 46 patents in its statutorily required information disclosure.  '474 Pt. App., dkt. #109-1.  It did not disclose the earlier rejections of the '158 and '162 applications based on Risafi.

Other prior art existed, such as the Visa cash cards introduced at the 1996 Atlanta Olympics, which allowed a consumer to buy a Visa Cash Card in a reloadable or predenominated form from a bank or vending machine and use it anonymously wherever the Visa Cash logo was displayed; U.S. Patent No. 6,129,275 issued to Urquhart in 2000, which disclosed the method of funding smart cards such as the Visa cash cards and were like the cards disclosed in plaintiff's '474 patent, wherein no "information associated with any

prospective cardholder is collected" and "the person acquiring the card [is not required] to provide any personal information"; and Japanese patent application, No. JP10-302, issued to Sugano and published in 1998, disclosing a prepaid card with a 10-16 digit password number printed on the card and disclosing the method of distributing prepaid cards in an unfunded state to merchants such as convenience stores, with the advantage that the unfunded cards would not require a high level of security.

In 1998 and earlier, some cards had denominations on the front whereas others did not. Non-predenominated cards give merchants greater sales flexibility. At least since 1999, a person designing a new card product would have known it could be designed with or without a PIN, depending on whether the card issuer wanted security or preferred speed and anonymity. Dkt. #64-9, Breitzke Dep.,Vol. II, at 324. ("debit cards prior to July 29, 1999 were available with PIN and/or signature and/or PIN"). Merchants were capable of processing both versions.

### E. Prior Litigation between the Parties

This is the parties' second lawsuit in this district. In 2009, plaintiff filed an action against the same defendants sued in this case, plus American Express Company, alleging infringement of plaintiff's U.S. Patent No. 7,328,181 patent, "Method for Transacting a Purchase Using a Non-Personalized Purchase Card." Hearing the case by consent, United States Magistrate Judge Stephen Crocker granted the American Express defendants' motion for summary judgment, after finding that plaintiff had failed to adduce sufficient evidence

to allow a reasonable jury to find that defendants had infringed plaintiff's '181 patent. PrivaCash, Inc. v. American Express Co., 727 F. Supp. 2d 1114 (W.D. Wis. 2010).  In his claims construction, the magistrate judge found that the term "non-personalized cardholder name" meant "a name that does not identify the purchase card as belonging to a specific cardholder and that is used by a retailer to complete a purchase transaction."  Order, dkt. #61, 09-cv-391-slc, at 3.

The magistrate judge found it unnecessary to reach the question whether defendants' accused products met the claim limitation in the '181 patent requiring plaintiff's card to be a "bearer instrument," but he noted that defendants' products could be canceled if they were lost or stolen, whereas plaintiff's card could not be deactivated or turned off.  It was like cash, in that if the card was lost or stolen, it could be used up to the available by anyone who found it.  Id. at 1124.  He rejected plaintiff's argument that defendants' cards were bearer instruments so long as they remained funded and activated, observing that nothing in the '474 patent defined bearer instrument so as to include cards that could be deactivated or turned off.  Id.  The Court of Appeals for the Federal Circuit affirmed the decision on the second ground, despite the magistrate judge's characterization of it as unnecessary.  PrivaCash, Inc. v. American Express Company, 435 Fed. App'x 939 (Fed. Cir. 2011).  It agreed with the magistrate judge's construction of the term "bearer instrument" or "bearer card," noting that the patent's use of the term was consistent with the usual meaning given to "bearer bonds" or "bearer securities" by financial dictionaries, which is that proof of ownership for such a security is possession of the instrument.  Id. at 941.  This

10

feature allowed owners to make purchases in confidence, something "vital to the primary advantage of the invention—anonymity." Id. at 942. Because PrivaCash could not show that deactivation of the accused cards could be accomplished without compromising anonymity, it failed to prove that the American Express cards infringed the '181 patent. Id. at 943.

### F. Examination Process

During the examination process, plaintiff did not disclose to the examiner the prior litigation between the parties or the rejections of two prior applications, 10/821,158 and 10/821,162, over Risafi. '474 Pt. App., dkt. #109-1. After the court of appeals held that the card claimed in the '181 patent was properly construed as a "bearer card" or "bearer instrument," plaintiff amended the claims of the '474 patent during the examination process to delete the term "bearer instrument" from the patent claims.

### OPINION

### I. CLAIM CONSTRUCTION

Any analysis of alleged infringement or invalidity must begin with construction of the terms at issue to determine their meaning and scope. Strattec Security Corp v. General Automotive Speciality Co., Inc., 126 F.3d 1411 (1997) ("Analysis of patent infringement involves two steps: (1) claim construction to determine the scope of the claims, followed by (2) determination of whether the properly construed claims encompass the accused

structure."); Dana Corp. v. American Axle & Manufacturing, Inc., 279 Fed. Cir. 1372, 1376 (Fed. Cir. 2002) (court may not invalidate claims of patent without construing disputed limitations of claims and applying them to allegedly invalidating acts). Once that is done, the construed claims can be compared to the product accused of infringing, Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), or to the allegedly invalid acts or to the prior art. Dana Corp., 279 Fed. Cir. at 1376. The process of construction is a matter of law for the court to decide. Markman v. Westview Instruments, Inc., 517 U.S. 370, 387 (1996). In this case, the parties dispute only two of the claim terms used in the patent: "purchase card" and "no information associated with any prospective cardholder is collected."

## A. Purchase Card

Plaintiff wants the term "purchase card" construed as "a card which may be used to make purchases when funded," but the suggested construction would render the claim term superfluous. Independent claims 1 and 17 would read: "the card, which may be used to make purchases when funded, 'when funded, being usable to make purchases . . . .'" Claim constructions should not render claim terms superfluous, but should be interpreted to give effect to all terms in the claim. Digital-Vending Services International, LLC v. University of Phoenix, Inc., 672 F.3d 1270, 1275 (Fed. Cir. 2012); Merck & Co. v. Teva Pharmaceuticals USA, Inc., 395 F.3d 1364, 1375 (Fed. Cir. 2005). Therefore, I will not adopt plaintiff's proposed construction.

Defendants propose the construction given plaintiff's card by the court of appeals in the prior case: "a bearer card which is as good as cash." This construction is hotly opposed by plaintiff, which argues that the construction is not found in the claims but is supported by only one statement in the specification ("In other words, each purchasing card **40** is a 'bearer card,' which means it is as good as cash." Col. 3, lns. 56-57). Plaintiff argues that (1) the term "bearer card" is used to describe only the preferred embodiment and the invention is not limited to the preferred embodiment; (2) plaintiff amended the claims of the '474 patent during examination to remove the term "bearer instrument" used in some of the claims; and (3) even if the card might be a bearer card in some of plaintiff's patents, it is not one in the '474 patent, which is limited to the three steps that take place before the card is turned over to the consumer, the last of which is funding the card.

As plaintiff notes, the general rule is that limitations set out in the specification and pertaining to a preferred embodiment are not to be imported into the claims, but this rule does not apply to statements in the specification that are "clear lexicographic definitions" or that describe a particular embodiment as important to the invention.   Edwards Lifesciences LLC v. Cook Inc., 582 F.3d 1322, 1329 (9th Cir. 2009) ("Although the construction of a claimed term is usually controlled by its ordinary meaning, we will adopt an alternative meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention . . . . Similarly, we will adopt a definition that is different from the ordinary meaning when "the patentee

13

acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history.") (citing CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366-67 (Fed. Cir. 2002)).  In this instance, plaintiff gave its card a special meaning in the specifications and that meaning "informs the proper construction of the claims." Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (citing Merck & Co. v. Teva Pharmaceuticals, USA, 347 F.3d 1367, 1371 (Fed. Cir. 2003)).  See also Sinorgchem Co., Shandung v. International Trade Commission, 511 F.3d 1132, 1138 (Fed. Cir. 2007) ("We have frequently found that a definition set forth in the specification governs the meaning of the claims.")

Plaintiff could have relied on the term purchase card without defining it.  The term had been used in other patents as of 1999.  E.g., U.S. Patent No. 7,020,633 (Strayer et al.), dkt. #103-5 (using "purchase card" as a generic term to refer to private label products, check cards, corporate cards, debit cards and Visa and Master Card products); U.S. Patent 5,577,109 (Stimson et al.), dkt. #109-6 (using the term "purchase card" synonymously with "prepaid card" to describe a card that may be used to purchase goods and services up to authorized dollar amounts).   Instead, plaintiff gave that critical claim term a clear definition in the specification.  Much as it maintains that it defined that term only for the purpose of describing the preferred embodiment, its argument is unpersuasive, given the centrality of the definition to the invention.

Plaintiff acknowledges that the Court of Appeals for the Federal Circuit found plaintiff's card to be a bearer instrument (a "card as good as cash"), that could not be

14

deactivated or canceled and that could be used up the limit available by anyone in possession of it, when it was used in plaintiff's earlier '181 patent, PrivaCash, Inc., 435 Fed. App'x at 941-42.  However, plaintiff points out that in the prior case, the court of appeals was construing the term "bearer instrument," as used in the '181 patent; it was not holding that all purchase cards within the scope of the invention must be bearer instruments or that every embodiment of the invention requires anonymity.  This is true, but irrelevant.  The goal of the inventors of the '474 patent was a card that would maintain anonymity, a point they made repeatedly in the specifications.  '474 pat., dkt. #48-5, col. 1, lns. 15-18, 46-48, 64-65; col. 2, lns. 6-7, lns. 17, 19-20, 26, 47 and 64-65.  As they wrote, "[t]he primary objective of the method is to create a non-traceable means to transact a purchase over the Internet."  Id. at col. 2, lns. 64-66.  Plaintiff has not explained how the invention would achieve its purpose if the purchase cards are not bearer cards.

Plaintiff's third argument is that it does not matter whether the card at issue is a bearer card because the claims in the '474 patent do not relate to the consumer's use of the card to make purchases but to the acquisition and funding of the card itself.  This argument is puzzling at best.  If the "invention" of the '474 patent has nothing to do with a card that promises anonymity, what is new and novel about it?  And, if anonymity is not a feature, why did plaintiff claim a method that authorizes the sale of unfunded purchase cards, "each card for sale not including any information associated with or provided by a prospective cardholder"?  '474 pat., dkt. #48-5, independent claims 1 and 17, cols. 6 & 7.  Plaintiff has left these questions unanswered.  Moreover, it has made no effort to explain why, if it was

15

not limiting its claims to "bearer cards" that are as good as cash, it disparaged non-bearer cards such as credit cards in its patent because they provided "a trail back to the consumer." '474 pat., dkt. #48-5, col.1, lns. 25-27.

Finally, plaintiff cites <u>Laryngeal Mask Co. Ltd. v. Ambu</u>, 618 F.3d 1367 (Fed. Cir. 2010), in support of its argument that because it amended the claims of the '474 patent during prosecution to delete the words "bearer instrument" from its claims, it would be improper for the court to add back the limitation. Although plaintiff deleted all references to "bearer instrument" from the claims, it did not delete the reference to "bearer card" in the specification. It retained the definition that "each purchasing card **40** is a 'bearer card,' which means it is as good as cash." In any event, <u>Laryngeal Mask</u> does not stand for the proposition that it is always improper to read a deleted limitation back into a claim. In that case, only some of the embodiments of the patent would have fit the description of the preferred embodiment. By contrast, the '474 patent gives no indication of a circumstance in which the purchase card disclosed in the patent would *not* have the attributes of a bearer card.

Accordingly, I conclude that the term "purchase card" in the '474 patent is properly construed as it is defined in the '474 patent: "a bearer card which is as good as cash."

### B. <u>No Information Associated with Any Prospective Cardholder is Collected</u>

The only other claim term for which the parties seek construction is found in claims 10 and 29. Claim 10 reads "The method of claim 1 or 5 wherein *no information associated*

16

*with any prospective cardholder is collected."* (Emphasis added.)  Claim 29 is identical except that the claims to which it refers are claims 17 and 24.

Defendants advocates giving this term its plain meaning; plaintiff wants to add at the end of the phrase the words: "by the party authorizing the funding."  Plaintiff fails to show why the claim needs any such addition other than to advance plaintiff's claims of infringement.  This is not a persuasive reason to expand the plain meaning of the term. Accordingly, I will give the term its plain meaning.


II. INVALIDITY

A. Background

In this case, the question of validity is more straightforward than that of infringement and it is dispositive.  Patent claims are invalid if they are anticipated, that is, if "every limitation is found either expressly or inherently in a single prior art reference," Celeritas Technologies v. Rockwell International Corp., 150 F.3d 1354, 1361 (Fed. Cir. 1998), or if they are obvious, that is, "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a); KSR International Co. v. Teleflex Inc., 550 U.S. 398 (2007).  Defendants contend that all of the claims of the '474 patent were anticipated or made obvious by the Risafi patent.  They bear the burden of proving their contention by clear and convincing evidence.

## B. Level of Ordinary Skill in the Art

At the outset, it is necessary to determine the level of ordinary skill in the art. In this case, the determination is straightforward. Plaintiff says that a person of ordinary skill in the art would have a bachelor's degree in business or the equivalent and four to six years of experience in the design and operation of payment card systems. Defendants accept plaintiff's version; in their own version, they proposed fewer years of experience.

## C. Risafi '500 Patent

Defendants say that the Risafi patent disclosed all of the elements of independent claims 1 and 17 of the '474 patent.

### 1. Claims 1 and 17

- a card offered for sale at retail establishments;
- a card distributed to retailers unfunded;
- a card that could be used to make purchases wherever Master Card was accepted;
- a card with an associated account number;
- a card that could be purchased and used with complete anonymity;
- a card usable, once funded, to make purchases at retail establishments that accepted Master Card (meaning that it was an "open loop" card); and
- a card funded for a specified amount of money.

The Risafi patent discloses batch activated cards as well as individually activated cards, but the disclosures relating to the batch activated cards can be disregarded because they are irrelevant. The issue is whether Risafi's disclosures about the distribution and funding of individual cards anticipate the disputed claims in the '474 patent or render them

18

obvious.

Plaintiff's only argument against anticipation and obviousness is that the security feature disclosed by Risafi (a PIN or verified signature) makes the Risafi disclosure entirely different from its own invention, which does not require either a PIN or a signature. Plaintiff maintains that Risafi's disclosure of a PIN to be provided by the prospective cardholder (on the theory that if it comes from the cardholder, it will be easier to remember), differentiates Risafi from claims 1 and 17, both of which claim "each card for sale not including any information associated with or provided by a prospective cardholder." Plaintiff places too much weight on an aspect of Risafi that was not inventive. The use or non-use of a PIN was known in the art in 1999, as was the use of a verified signature. Adding it or deleting it would not have been an inventive act. Rather, it was a classic example of combining familiar elements according to known methods to yield predictable results. KSR, 550 U.S. at 415-16. Choosing to use one or the other or neither was merely a marketing or design choice.

Plaintiff argues that Risafi "teaches away" from cards having preset values, thereby negating the obviousness of plaintiff's invention. This argument is equally unpersuasive. "Teaching away" refers to discouraging a person of ordinary skill in the art from following the path set out in the reference or encouraging the person to head off in a different direction. Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH, 139 F.3d 877, 885 (Fed. Cir. 1998) (prior art reference teaches away when "'a person of ordinary skill upon reading the reference would be discouraged from following the path set out in the reference,

19

or would be led in a direction divergent from the path that was taken by the applicant.'") (quoting In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994)).  The concept would not refer to anything as simple and straightforward as whether to limit prepaid cards to a preset value or not.  Again, that is a simple marketing decision, not a question of invention.

Plaintiff does not deny that every element of its invention was known in July 1999, but it argues that the genius of its invention came in choosing among "millions of possible combinations of the 'old elements,'" such as the  type of card (debit, credit, phone, etc.), type of funding (prefunded or variable load), the material (paper or plastic), type of distribution (single, bulk, mail, etc.) and so on.  Plt.'s Br., dkt. #114, at 32.  A close look at the choices shows that many of them were nothing more than design choices; many if not most of them have nothing to do with the choices plaintiff made in the '474 patent, such as paper or plastic for the card or "existing system" point of sale terminals versus reprogrammed systems, neither of which is covered in the '474 patent; and Risafi had made the truly inventive choices in her patent.

In sum, I find that the "differences between the subject matter sought to be patented and the prior art are such that the subject matter would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).  (For the purpose of this discussion I have assumed that the '474 patent disclosed a PIN-less card, as plaintiff maintains, despite the assurance in the patent specifications that residual funds left on the card could be withdrawn from an automated teller machine, dkt. #48-5, col. 5, lns. 31-36, and plaintiff has never explained

how that could be done without a PIN.)  Because Risafi disclosed all of the limitations of claims 1 and 17 of the '474 patent, with the exception of a PIN-less card, which was a variation that would have been known to persons of ordinary skill in the art in 1999, and because plaintiff has not adduced any evidence of secondary considerations, such as a long-felt need for the invention, commercial success, copying by others or unexpected success. (In the latter category, plaintiff has submitted the declaration of David Sutton, one of the inventors named on the '474 patent.  Dkt. #102.  Sutton avers that when he and his co-inventor tried to commercialize the invention, they were met with skepticism and resistance from persons in the industry who had always thought of credit and debit cards as personal, id. at 2, but this averment does not support a finding that in May 2004, when the application for the '474 patent was filed, it revealed a true invention.  I find that defendants have shown by clear and convincing evidence that Risafi renders these two claims obvious.

2. Disputed dependent claims 10, 29 and 36

These claims read as follows:

10. The method of claim 1 or 5 wherein no information associated with any prospective cardholder is collected.

29. The method of claim 17 or 24 wherein no information associated with any prospective cardholder is collected.

36. The method of claim . . . 17 wherein the funding [of] a purchase card account is done without requiring the person acquiring the card to provide any personal information.

21

Defendants contend that Risafi renders all three of these claims obvious because it discloses the invention of issuing a prefunded card without collecting any information associated with the prospective cardholder or requiring the person acquiring the card to provide any personal information.  Plaintiff has offered no argument in opposition, except to say that because the three claims at issue are multiple dependent claims, defendants cannot prove invalidity unless they show the invalidity of both of the claims from which each of the three depend.  In other words, defendants cannot show that claim 10 is obvious unless they can show that both claims 1 and 5 are obvious.  However, the law is to the contrary.  35 U.S.C. § 282 ( "Each claim of a patent (whether in independent, dependent or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim."); Atlas Powder Co. v. Ireco, 190 F.3d 1342, 1346 (Fed. Cir. 1999); 35 U.S.C. § 103 ("A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.").

Because plaintiff has shown no reason why these claims might be found invalid, I conclude that defendants have shown by clear and convincing evidence that claims 10, 29 and 36 are invalid in light of Risafi.

3. Dependent claims 12-16 and 31

12. The method of claim 11 wherein the one of the purchase cards has an associated card date beyond which the card may not be used and wherein

22

authorizing a purchase transaction occurs after verifying that the date of the purchase transaction is not beyond the card date.

13. The method of claim 12 wherein the card date is imprinted on the card.

14. The method of claim 12 wherein the purchase cards are distributed in blocks of cards.

15. The method of claim 11 wherein authorizing funding of a purchase card account is done using a software-implemented application.

16. The method of claim 11 wherein each of the purchase cards, once funded, is usable at online retail establishments and bricks-and-mortar retail establishments.

31. The method of claim 30 wherein the one of the purchase cards has an associated card date beyond which the card may not be used and wherein authorizing a purchase transaction occurs after verifying that the date of the purchase transaction is not beyond the card date.

Plaintiff's only argument about the validity of these claims is that defendants have not shown that the claims from which they depend are obvious.  Because such a showing is not necessary, 35 U.S.C. § 282, and also because I have found to the contrary, I find that defendants have shown by clear and convincing evidence that each of these claims is invalid for obviousness.

4. Dependent claims 4 and 23

Claims 4 and 23 read as follows:

4. The method of claim 1 or 2 wherein each of the purchase cards has imprinted thereon a predetermined monetary denomination.

23. The method of claim 17 or 21 wherein each of the purchase cards has imprinted thereon a predetermined monetary denomination.

23

In support of these claims, plaintiff argues that Risafi did not disclose a predetermined amount and, in fact, taught away from imprinting set amounts on cards. As explained above, even if a preference for not imprinting set amounts on cards could be characterized as "teaching away," which is unlikely, it is not a reason to find lack of obviousness when the invention is obvious to anyone of ordinary skill in the art, Brunswick Corp., 689 F.2d at 749-50. In this instance, predenominated purchase cards were known in the art in 1999, when plaintiff filed its original patent application. Accordingly, I find that defendants have shown by clear and convincing evidence that each of these claims is invalid for obviousness.

## III. INFRINGEMENT

Although I have found that all of the contested claims of the '474 patent are invalid for obviousness, for the sake of completeness, I will take up the issue of infringement briefly. It requires little discussion because the Court of Appeals for the Federal Circuit decided the issue in PrivaCash, Inc. v. American Express Co., 435 Fed. App'x 939 (Fed. Cir. 2011), and its decision is equally applicable to this case.

Both the '181 patent before the Federal Circuit and the '474 patent before this court disclose a "bearer card" that cannot be activated or canceled within the meaning of the applicable patent. The '474 patent provides in the specifications that "[s]hould the consumer lose or misplace the purchasing card 40, it may be used up to the limit available on the card by anyone in possession of the card." "474 pat., dkt. #48-5, col. 3, lns. 57-60.

24

As the court of appeals pointed out, "deactivation allows lawful owners [of the American Express gift cards] to nullify any value the card has to a possessor and to retrieve the remaining monetary value on the card.  As such, simple possession of the American Express gift card does not constitute effective ownership of the card."  PrivaCash, 435 Fed. App'x at 942.

Plaintiff argues that the '474 patent is different from the '181 patent that was before the court in 2011 because the '474 patent is directed only to the three steps of (1) authorizing the sale of unfunded physical purchase cards; (2) authorizing distribution of the cards to purchase card outlets; and (3) authorizing funding of a purchase card account, which means that it is irrelevant whether defendants' cards require signatures.  In other words, the patent does not address the use of the cards, so it is irrelevant whether defendants impose a signature requirement or allow for deactivation; those features never come into effect until after the three steps disclosed in the patent are complete.  This is an interesting but ultimately unpersuasive argument because it overlooks the provision in independent claims 1 and 17: "when funded, the card being usable to make purchases."

Defendants' accused gift cards are not usable to make purchases after they are funded *until* they are signed.  It is true that the signature requirement matters only when the consumer uses the card in a brick and mortar store and that the cards can be used for online purchases or in consumer-activated terminals without signatures.  The point is that they are not designed to be anonymous, as is the card disclosed in the '474 patent, and they are not designed to be usable as soon as they are funded.  They can be used only when they

25

are signed.  Moreover, the cards may be deactivated by consumer purchasers.  I conclude that the features of deactivation and required signatures differentiate defendants' cards from the invention claimed in the plaintiff's '474 patent and that defendants are entitled to summary judgment on this issue.

## IV. INEQUITABLE CONDUCT

Plaintiff moved for summary judgment on defendants' eleventh affirmative defense of inequitable conduct.  Because I am granting defendants' motions for summary judgment on infringement and invalidity, there is no reason to determine whether inequitable conduct would provide defendants another defense to plaintiff's claim of infringement. It will be denied as moot.

## ORDER

IT IS ORDERED that

1. The term "purchase card" in U.S. Patent No. 8,219,474 is construed as a "bearer card which is as good as cash."

2. The term used in claims 1 and 5 of the '474 patent: "The method of claim 1 or 5 wherein no information associated with any prospective cardholder is collected" is not construed because it needs no construction.

3. All of the challenged claims of the '474 patent (1, 4, 10-17, 23, 29, 31 and 36) are invalid because they are rendered obvious by U.S. Patent No. 5,473,500 (Risafi).

4. The motion for summary judgment on the invalidity of U.S. Patent No. 8,219,474 and non-infringement of U.S. Patent No. 8,219,474 filed by defendants American Express Travel Related Services Company and American Express Prepaid Management Corporation, dkt. #58, is GRANTED.

5. Plaintiff PrivaCash, Inc.'s motion for summary judgment of infringement, dkt. #49, is DENIED.

6. Plaintiff's motion for summary judgment on defendants' eleventh affirmative defense of inequitable conduct, dkt. #45, is DENIED as moot.

The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 21st day of July, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge